**Samuel Christopher HAWKINS, Petitioner–Appellant,**

v.

**James A. LYNAUGH, Director, Texas Department of Corrections, Respondent–Appellee.**

No. 86–1774.

United States Court of Appeals, Fifth Circuit.

April 29, 1988.

Samuel Christopher Hawkins, pro se.

Joel Berger, New York City, for amicus —NAACP Legal Defense and Educational Fund, Inc.

Paula C. Offenhauser, Asst. Atty. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for respondent-appellee.

Before RUBIN, KING, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Samuel Christopher Hawkins represents himself in this court, urging that his conviction of capital murder and sentence of death by a Lubbock County, Texas, jury should be set aside for three reasons. He argues that his "trial was had by use of perjured testimony[,] ... [t]he confession was extracted and obtained in violation of petitioner's right not to be compelled to give evidence against himself [, and] ... [t]he evidence is insufficient to sustain the conviction and verdict of the jury." We are persuaded that the contentions are without merit and that the district court properly denied Hawkins' petition for federal habeas relief, and we affirm.

## I

Hawkins was convicted of capital murder for killing Abbe Rodgers Hamilton, while attempting aggravated rape. The jury answered the special questions required by Texas law,[1] and Hawkins was sentenced to die. In April 1978, Hawkins' motion for new trial was denied. In July 1980 the state trial court, following a hearing, granted Hawkins' request to represent himself on appeal but authorized appointed counsel to file a brief as amicus curiae. Hawkins raised fifteen separate grounds of error, and appointed counsel added seven separate grounds.

The Court of Criminal Appeals rejected all grounds of error except appointed counsel's contention that Hawkins was entitled to a competency hearing before his trial. The court remanded the case to the trial court for a "retrospective competency determination," with instructions to order a new trial if a retrospective determination was not possible or if Hawkins was found to have been incompetent to stand trial. Both the state and Hawkins sought rehearing, and on August 9, 1983, Hawkins filed with the Court of Criminal Appeals a request to waive the competency issue. Finally, on October 19, 1983, the court accepted the waiver and affirmed Hawkins' conviction.

Hawkins did not seek review by the Supreme Court and has not requested any state habeas corpus relief. While his conviction was pending before the Court of Criminal Appeals, Hawkins petitioned for federal habeas relief from the Northern

---

1. *See,* Tex. Code Crim.Proc. Ann. art. 37.071  (Vernon 1981).

District of Texas, but suffered a dismissal for want of exhaustion of remedies. He filed a second petition for federal habeas relief in November, 1983. The federal district court rejected his request for stay as premature, but on April 30, 1984, after formal sentencing by the state court, granted the stay now in effect.

After waiting for the Supreme Court's decision in *McKaskle v. Wiggins*,[2] the federal district court ordered a competency hearing to assure Hawkins' competency to decide to proceed without a lawyer. After his examination at the federal hospital in Springfield, Missouri, a magistrate conducted an evidentiary hearing and concluded that Hawkins was, as he urged, competent to decide. The magistrate then warned Hawkins of the risks of proceeding without counsel and questioned him on the record to confirm that he still wanted to do so. Satisfied of his competency and wishes, the magistrate granted Hawkins' request to discharge appointed counsel.

The magistrate gave Hawkins leave to amend to assert any additional claims at any time before January 15, 1985, later extended to August 19, 1985. Hawkins filed no additional claims. On September 30, 1985, a magistrate filed an order identifying from Hawkins' papers what he believed to be seven grounds of error and recommended that the district court dismiss for want of exhaustion. Hawkins disagreed, insisting that he had only the following four points of error:

1. The trial court erred in committing aggravated (sic) perjury, also committed with and agreed to by the State's Attorneys Steve Cross and Linda Walden, Defense Counsels (sic) Russell Busby and Gene Storrs.

2. The Trial Court erred in introducing the confession into evidence over Pe-

titioner's objection and motion to suppress.

3. The Court erred in sentencing Petitioner to death because the evidence is insufficient to sustain the Jury's verdict.

4. The State did not prove the allegations in this case and they are left unproved.

The State responded by waiving any failure to exhaust state remedies.

In a lengthy report, the magistrate, without an evidentiary hearing, rejected the four arguments and recommended dismissal of the habeas petition. The district court dismissed the habeas petition on October 21, 1986, over the written objections of Hawkins, but granted Hawkins' request for a certificate of probable cause and stay of execution pending appeal.

This court then informed Hawkins by letter that it would appoint counsel for him on appeal and warned him of the risks of representing himself. He replied in writing, again insisting that he did not want a lawyer. To date, Hawkins has represented himself in this appeal.[3]

## II

### 1

We review the sufficiency of the evidence to support a state criminal conviction solely by a constitutional measure. The question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[4] State law defines the substantive elements of the offense and the state's determination that the evidence was sufficient is entitled to "great weight."

---

**2.** 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (holding that a petitioner's sixth amendment right to conduct his own defense was not violated by participation of standby counsel).

**3.** With Hawkins' consent, the NAACP Legal Defense and Educational Fund filed an *amicus curiae* brief and argued the case orally.

**4.** *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

The trial evidence is summarized in *Hawkins v. State.*[5] As that court described the events:

William Hamilton testified he and his wife, Abbe, lived in Borger. On May 2, 1977, Hamilton left his home late in the evening in order to report to work by 11:30 p.m. Before Hamilton left for work, he and his wife had sexual intercourse. At the time he left, Hamilton's wife was in bed, clothed in a gown and a pair of panties. When he returned home the following morning at 9:00 a.m., Hamilton found his wife still asleep in the bed. He then left the house for approximately 45 minutes. Upon returning, Hamilton found his wife who was six months pregnant lying in the blood-soaked bed with her hands and feet bound with pieces of red and white cloth. Hamilton immediately attempted to call an ambulance but discovered that the phone line had been cut. He then went to the home of a neighbor, Hollis Mahon, who in turn notified authorities of the discovery of Hamilton's wife. Grace Mahon testified that after Hamilton used her phone, she went to Hamilton's house and saw his wife's body. She related that her efforts to locate a pulse were unsuccessful.

Officer Bruce Lemery, of the Borger Police Department, testified he was the first officer to arrive at the scene of the offense. The victim had been stabbed numerous times with several severe wounds about the neck. Although the victim was still clothed in a gown, she was no longer wearing panties. A pair of panties was found a short distance from the bed.

Sheriff Lon Blackmon, of Hutchinson County, testified he took custody of various items of evidence found at the scene of the offense. Among these items were the panties, two napkins found underneath the victim's body and the pillowcases off the bed. Blackmon sent these items to the Federal Bureau of Investigation (FBI) laboratory in Washington, D.C., for analysis.

Special Agent Robert Spalding, of the FBI, testified that he worked in the field of forensic serology which is the study of blood and body fluids in stain form. Spalding related that tests run upon the panties he received from Blackmon proved positive for the presence of seminal materials or stains.

Officer J.D. Reimer, of the Lubbock Police Department, testified that on March 7, 1978, he collected several hair samples from appellant's head. Reimer turned these samples over to FBI Special Agent Robert Neill.

Neill related that he was a specialist in the field of forensic microscopy which is the study of fibers, hairs and textiles using microscopic methods. An examination of the napkins found under the victim's body revealed numerous human hairs. Neill found some of the hairs on the napkin to have been of a "negroid origin." A comparison of the hair samples received from Reimer and those found on the napkin showed all of the hairs to have the same range of microscopic characteristics. Neill's analysis revealed twenty similarities between appellant's hair and the hair found on the napkin at the scene of the offense. The comparison between the hairs did not show any dissimilar characteristics. Neill testified that it was his opinion that the hairs found on the napkins had come from appellant or some other person with an identical range of hair characteristics.

The victim's husband, William Hamilton, was recalled to the stand and testified that no blacks lived near his home. He further stated that he had never had a black person enter his home.

Christine Cantrell testified she lived near the Hamilton home. At 9:30 a.m. on the morning of the offense, Cantrell noticed a light two-tone car in the victim's driveway. The car she saw was of the same type which was later discovered at appellant's home. Cantrell further stated that she saw a tall slender black man standing next to the car in the victim's driveway.

5. 660 S.W.2d 65 (Tex.Crim.App.1983).

Dr. Jose Diaz–Esquivel performed an autopsy upon the deceased. His examination revealed four wounds to the neck which appeared to have been made with a knife-like instrument. One of the wounds was approximately one and three-quarters inches deep and had severed the victim's jugular vein. Diaz–Esquivel stated that the victim had bled to death as a result of her neck wounds. Tests revealed that the victim had intercourse within twenty-four hours of her death.

Larry Clark testified he was appellant's supervisor at the Iowa Beef plant. The plant was shown to be approximately fifty miles from Borger. Appellant reported for work at 2:40 p.m. on the day of the offense. Clark stated that appellant was employed as a trimmer on a fleshing crew at the plant. Appellant's work called upon him to be semi-skilled in the use of an instrument called a skinner's knife.

Detective James LaFavers, of the Amarillo Police Department, testified that appellant was arrested for an unrelated offense on June 30, 1977. Following his arrest, appellant signed a written statement concerning the instant offense. A portion of that statement is as follows:

"My name is Samuel Christopher Hawkins ... A short while ago, I can't remember exactly when, I drove to Borger, Texas with a friend.... We went in my friends car. The man I was with met one of his old girl friends and stayed with her so I took his car. I started looking around Borger for somebody to rape. I drove to the south part of Borger. I started checking doors and came to a house that had one open. This house was facing west, and it had a drive way that went north and south. The house was a red color and they were building a room on the end of it. There was a red Monte Carlo, I think it was about a 1976 model, parked in the driveway. There was also another small car in the driveway and I think it was a Pinto or a Vega. I parked my car in the area of the driveway, right behind the Monte Carlo and Pinto. I checked the door and it was open. I walked straight into a bedroom that seems like it was kind of behind the kitchen and to the left. I had a hunting knife that I had bought at the T.G. & Y. store on 24th. and North Grand st. (sic) in my hand. I noticed a woman lying on a bed on her side. I put the knife to the womans throat and she jumped. When the woman jumped, the knife went into her neck. The woman got hysterical and reached up and felt the blood on her neck and started screaming 'give me a towel, give me a towel.' When the woman got hysterical, I did to. I started stabbing the woman in the neck but I don't know how many times I stabbed her. When the woman became hysterical, she grabbed the telephone and was going to call on it. I guess this is when I cut her again. The woman was holding the phone, and I took the knife and cut the wire. I then went into the dining area and got some red and white napkins. The red and white design was in squares. I made an attempt to calm her down and tie her up. I had cut the napkins with the knife that I had and used these to tie her with. The woman wouldn't give up so this is when I cut her again. I couldn't tie the woman up as such so the knots stayed loose. I did not think that the woman was dead when I left but I didn't know for sure. I did not rape this woman but I intended to when I went in the house. I got scared when I stabbed the woman and this is why I didn't rape her and I ran out of the house...." [6]

## 2

Under the Texas Penal Code, intentional murder while attempting aggravated rape is a capital crime.[7] A person commits ag-

**6.** *Id.* at 72–74.

**7.** *See* Tex. Penal Code Ann. § 19.03(a)(2) (Vernon 1974).

gravated rape either (1) by causing serious bodily injury or attempting to cause death or (2) by rape by threats of death, serious bodily injury, or kidnapping.[8] The offense of attempt is established by evidence of specific intent to commit aggravated rape and "an act amounting to more than mere preparation." [9]

Hawkins argues that the evidence was lacking in that his confession did not "mention the killing of Abbe Rogers (sic) Hamilton ... [and] ... [n]o one is named in the confession or statement[,] ... [and there is] ... no evidence of attempted sexual intercourse without ... consent[,] ... no evidence to show that she was compelled to submit by the use of a threat[,] ... no weapon was introduced to show what the deceased ... was killed with."

█ Hawkins' argument ignores the jury's right to draw reasonable inferences from the evidence. A review of the facts recited by the Texas Court of Criminal Appeals makes plain that the evidence was strong indeed. Hawkins' confession placed him at the scene. The location of the body, the cuts about the neck, the placement of the napkins, and the similarity of hair samples collectively confirm Hawkins' confession. There was also evidence that the victim's panties had been removed and were found near the bed. Moreover, Hawkins admitted that he intended to rape her. This was sufficient to meet the constitutional test, and there our inquiry stops.

### III

Hawkins urges in his second point that the "confession was extracted and obtained in violation of petitioner's right not to be compelled to give evidence against himself." The argument has three related parts: that he was induced to confess by promises of psychological and psychiatric help or treatment through the court system, that he was denied counsel, and that he was not given his *Miranda* rights—all in an interrogation away from family and friends by up to eleven police officers, which continued from his arrest at 11:30 a.m. on June 30 until the next morning at 6:00 a.m.

The state trial court, after an extensive hearing [10] before trial, denied Hawkins' motion to suppress confession. It found that Hawkins "was not coerced into making any statement by any force, threats, persuasion or promises or any other improper influence" and that he "waived his right to be represented by counsel." The Texas Court of Criminal Appeals affirmed this ruling.[11]

█ The ultimate question of the voluntariness of a confession is due independent federal review,[12] but with "great weight to the considered conclusions of a coequal state judiciary." [13] Questions of fact determined by the state court, and subsidiary to the conclusion, enjoy the presumption of correctness conferred by 28 U.S.C. § 2254(d).[14] We turn to those facts.

According to the state's witnesses, including the arresting and interrogating officers, Hawkins was arrested at his home on June 30 at approximately 11:30 a.m. He was taken directly to the Amarillo, Texas police station where he received *Miranda* warnings.[15] The officers testified that they suspected that Hawkins was responsible for a series of rapes and murders that had occurred in the area and asked Hawkins about them. The officers testified that Hawkins was first interviewed by De-

8. *See* Tex. Penal Code Ann. § 21.03(a) (Vernon 1974).

9. Tex. Penal Code Ann. § 15.01(a) (Vernon 1974).

10. *See Jackson v. Denno*, 378 U.S. 368, 376–77, 84 S.Ct. 1774, 1780–81, 12 L.Ed.2d 908 (1964) (holding that defendant is entitled to a hearing on the issue of voluntariness of a confession).

11. *See Hawkins v. State*, 660 S.W.2d 65, 72 (Tex. Crim.App.1983).

12. *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 451, 88 L.Ed.2d 405 (1985).

13. *Id.* (citations omitted).

14. *Id.* (citations omitted).

15. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tective Garner around noon but made no statement at that time and that he was booked into city jail at approximately 3:00 p.m. where he remained until approximately 6:00 p.m., when he was put in a lineup. The officers testified that Hawkins never requested a lawyer, but twice talked with his wife by phone and once visited alone with her in mid-afternoon. There was testimony that Officer Kirkwood questioned Hawkins for approximately 30 minutes at around 9:00 p.m. and that Lieutenant Jimmy Boyston interviewed him until approximately 10:40 p.m.

A black officer, Isaiah Garrett, then spoke with Hawkins alone, and Hawkins indicated that he wanted to talk. Detective James LaFavers and Captain Smith testified that they again warned Hawkins of his *Miranda* rights before taking his statement. They also testified that they turned a tape recorder on around 11:30 p.m., but it taped for only one hour. Sometime during the early morning hours, the officers gave Hawkins a carton of milk and a piece of pie. Hawkins ultimately confessed to three offenses and signed three statements typed by a police officer. The second statement, approved by Hawkins at 4:05 a.m., described the murder of Abbe Hamilton.

The officers testified that they gave Hawkins a hamburger and french fries in mid-evening. Officer Garrett testified that Captain Smith asked Hawkins if he was tired and wanted to resume the next day after he had slept, but that Hawkins replied that he could not sleep and wanted to get it over with. All of the officers denied making any promises to Hawkins regarding his prospects for help from the courts or others for any mental illness.

Hawkins' testimony about his confession was quite different. He testified that he was not warned of his rights and was denied counsel despite his repeated requests for a lawyer. Hawkins testified that Detective Eaton told him he was schizophrenic, that Officer Garrett told him he was sick and that "they" wouldn't hold it against him but would get him help; that Detective LaFavers told him that if he con-

fessed he would get treatment. He admitted that he was allowed to telephone his wife on two occasions and meet with her in mid-afternoon. Hawkins testified that he asked his wife to contact a local lawyer named Broadfoot.

Broadfoot testified that Hawkins' wife called him in late evening, that he called the station sometime after 10:30 p.m., and that he was told that Hawkins was suspected in some area rapes and murders. Broadfoot explained that he then reported this to Hawkins' wife, but he was not hired.

The Justice of the Peace of Potter County testified that his normal hours were from 8:30 a.m. until 5:00 p.m. but that he occasionally arraigned prisoners at other hours. He explained that he would ordinarily appoint counsel at arraignment if a prisoner was indigent. He testified that Hawkins first appeared before him at 2:35 p.m. for a bond hearing with counsel.

In short, the state trial judge was presented with a "swearing match." He believed the state's witnesses. The Texas Court of Criminal Appeals upheld these findings.[16] The federal district court found the findings fairly supported by the record. We also are persuaded that the factual findings are supported by the record. Accepting these subsidiary facts, we have considered independently the ultimate issue of whether Hawkins' confession was voluntary. We are persuaded that it was.

■ Hawkins' main contention is that he was induced to confess by promises of help for his "illness." Toward the beginning of the recorded portion of Hawkins' confession, Detective LaFavers made the following statement:

LAFAVERS: Mr. Hawkins its a ... you know a lot of the problem in life is the fact that you have the ability to admit that problem to yourself. You know its a its not as much what you admit to others as it is being of the personality that you can admit it to yourself and I think you are doing it now and I think that you are probably overcoming a lot of the problem that you have been sup-

---

16. *See Hawkins,* 660 S.W.2d at 72.

pressing over the years. Its ... Its something that I can understand. It a ... It's something that you yourself can't hold yourself at fault for. It a ... It is something that occasionally happens to some of us, but its nothing that can't be helped. Its something that we can help you with and we'll try. We will do that. We understand what your situation is, we do. We're not here to in any way punish you or criticize you because it is understandable what your situation is.

Then, toward the end of the taped portion, after Hawkins had confessed to a series of rapes and attempted rapes and as the officers were preparing a typed statement for Hawkins to sign, the following exchange took place:

HAWKINS: Will they sentence me to die for that?

LAFAVERS: Huh?

HAWKINS: Will they sentence me to die for that?

LAFAVERS: Sam, to be honest with you I would ... I would think that the courts in your situation *wouldn't* [17] be very lenient. I really do. I think that they will observe the fact that you need help ... you're trying to seek that help already psychological—psychiatric help and a ..., I think they would recommend a psychiatrist. Okay.

GARRETT: Sam, this is a sickness that started when you was a kid.

LAFAVERS: The thing to do Sam—this drive that you are talking about is something that has been eating at you and any time you have a drive that eats at you with the severity that this was. We are talking about sickness. Its nothing that gets .. its like .. you know. It's just as real to have an illness of this type and when you really have a possession of this type and it happens to several people. You're not alone in this. It ... it happens to thousands and thousands of people so don't be a ... ashamed of the fact that your illness happens to be men-

tal instead of physical because this is not more your fault than if you had caught cold.

HAWKINS: But why me?

In earlier proceedings, there was some disagreement over whether Detective LaFavers had said "would" or "wouldn't." The Texas Court of Criminal Appeals described the tape as using the word "wouldn't" but did not suggest it was resolving a conflict. The federal district court also found that LaFavers had said "wouldn't." The "to be honest with you" would seem to lead more naturally into an "I wouldn't"; however, the "I really do" would seem to follow more naturally from an "I would." We cannot say that the federal district court's finding is clearly erroneous and that is the applicable standard of review; however, even assuming *arguendo* that LaFavers did say "would," such a finding would not alter the outcome of this appeal.

For, when viewed under the totality of the circumstances, we are persuaded that Detective LaFavers' comments did not cross the line between expressions of sympathy and kindness and promises of leniency. "A promise is not the same thing as a prediction about future events beyond the parties' control or regarded as inevitable." [18] When viewed from Hawkins' perspective, LaFavers' statements cannot be deemed to have included a promise of a benefit that, in Hawkins' eyes, LaFavers had the power to either grant or withhold. On the contrary, LaFavers' remarks were carefully couched in terms of his personal opinion—"I would think." Whether the officers overreached is not answerable by a process of semantical categorization. Rather, the question is whether the language used under all the facts and circumstances would lead Hawkins to reasonably believe that he would not be held criminally responsible or put to death. [19]

As did the court in *Miller v. Fenton*, we view the statements as "a means of convincing [Hawkins] that [LaFavers] was

---

17. Emphasis added.

18. *United States v. Fraction*, 795 F.2d 12, 15 (3d Cir.1986).

19. *See United States v. Shears*, 762 F.2d 397 (4th Cir.1985).

sympathetic, no matter what the state's reaction might be." [20] There, the court interpreted statements such as "you are not responsible" and "you are not a criminal" to mean "In my eyes, you are not responsible or a criminal and therefore you should relieve your conscience by talking to me, who understands you," [21] and we do the same. Although we recognize that under Texas law, an oral confession is inadmissible and that these statements were made before Hawkins signed a written confession, Hawkins already had confessed to a capital crime before he asked whether he would be sentenced to die, and we thus find from the record an evidentiary basis for the district court finding that the misrepresentations were not the catalyst for Hawkins' willingness to confess.

As for LaFavers' earlier outright promises of help, a promise of "help" might, arguably, be heard to mean that a defendant would receive psychiatric counseling in lieu of imprisonment. However, LaFavers made no direct promise of leniency but only a direct promise to get Hawkins help, which could be considered at most an implication of leniency, and "indirect promises do not have the potency of direct promises." [22] In *Bram v. United States*,[23] the Supreme Court held that a confession may not be " 'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight.' " [24] However, the *Bram* test "has not been interpreted as a *per se* proscription against

promises made during interrogation," [25] and the test has been tempered by subsequent holdings that, depending on the totality of the circumstances, certain representations will not render a confession involuntary.[26]

■ We are persuaded by the totality of the circumstances that LaFavers' statement falls within the spectrum of permissible representations. Hawkins knew of his *Miranda* rights.[27] Although the interrogation lasted into the early morning hours,[28] Hawkins himself made the decision to "get it over with" rather than to return to his cell for rest, and he was not deprived of refreshment. We cannot say that the interrogation was "so prolonged and unremitting, especially when accompanied by deprivation of refreshment, rest or relief, as to accomplish extortion of an involuntary confession." [29] Furthermore, Hawkins was in no physical discomfort.[30]

■ There is little doubt but that the officers were hoping for psychological advantage by their tactics, such as sending in a black officer to play to Hawkins professed dislike for "honkies" and their studiously relaxed questioning and expressions of understanding. However, there is nothing inherently wrong with efforts to create a favorable climate for confession. Neither "mere emotionalism and confusion," [31] nor mere "trickery" [32] will alone necessarily invalidate a confession. Although LaFavers' statements undoubtedly contribut-

**20.** *Miller v. Fenton*, 796 F.2d 598, 609 (3d Cir.), *cert. denied, sub nom; Miller v. Neubert*, —— U.S. ——, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986).

**21.** *Id.*

**22.** *Id.* at 610.

**23.** 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

**24.** *Id.* at 542–43, 18 S.Ct. at 186–87 (quoting 3 Russell on Crimes 478 (6th ed.)).

**25.** *Miller v. Fenton*, 796 F.2d at 608.

**26.** *See Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (holding a confession is voluntary so long as the promise did not overbear defendant's will); *Shears*, 762 F.2d at 401.

**27.** *Cf. Robinson v. Smith*, 451 F.Supp. 1278, 1282 (W.D.N.Y.1978).

**28.** *Cf. Miller v. Fenton*, 796 F.2d at 606.

**29.** *Stein v. New York*, 346 U.S. 156, 184, 73 S.Ct. 1077, 1092, 97 L.Ed. 1522 (1953).

**30.** *Cf. Leyra v. Denno*, 347 U.S. 556, 559–60, 74 S.Ct. 716, 718, 98 L.Ed. 948.

**31.** *See Corn v. Zant*, 708 F.2d 549, 567 (11th Cir.1983), *cert. denied*, 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984).

**32.** *See United States v. Castaneda–Castaneda*, 729 F.2d 1360 (1984), *cert. denied*, 469 U.S. 1219, 105 S.Ct. 1202, 84 L.Ed.2d 345 (1985).

ed to Hawkins' urge to confess, the sum of the events are not such that those statements would have produced "psychological pressure strong enough to overbear the will of a mature, experienced man."[33] Indeed, Hawkins was assertive enough and intelligent enough to demand the anonymity of the person whose car he utilized in the Hamilton murder. We are not persuaded that the confessions were not voluntarily given, and we turn to Hawkins' final point.

## IV

 Hawkins urges that the state knowingly offered perjured testimony. This argument revolves around the interpretation of the recorded portion of Hawkins' interrogation. Hawkins argues that the tape demonstrates that the officers lied at trial when they denied promising psychiatric and other assistance. The state court rejected this argument concluding that "[t]here is nothing in the testimony of Garrett, nor elsewhere in the record to show that any part of his testimony was false or that the State knew of and conspired to present any alleged perjury."[34] The state trial court and jury, given the primary task of deciding the facts, accepted the credibility of the officers.

Much of the debate over the use of perjured testimony compares the testimony of Detective LaFavers in which he denied promising help for Hawkins with the tape recording of the interrogation. We are persuaded that Hawkins has failed to demonstrate any knowing use of false testimony by the State. The credibility of the officers and Hawkins was the central issue before the state courts in its decision that Hawkins' confession was voluntary. As we have explained in rejecting Hawkins' attack on the state's use of his confession, we have accepted the subsidiary facts as being fairly supported by the record. The asserted discrepancy between the tape and Detective LaFavers' testimony does not alter that conclusion. Regardless, any conflict between the tape and Detective La-

Favers' testimony at trial or at the hearing on the motion to suppress was not so indisputably plain that we can reject the conclusion of all courts that Hawkins' charges that the state made knowing use of perjured testimony were without merit.

AFFIRMED.

---

**33.** *Miller v. Fenton,* 796 F.2d at 613.

**34.** *Hawkins v. State,* 660 S.W.2d at 75.