# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00287-CR

**Daniel Timothy Ozuna, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 391ST JUDICIAL DISTRICT NO. D-09-0854-SA, HONORABLE THOMAS J. GOSSETT, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A grand jury returned an indictment charging appellant Daniel Timothy Ozuna with indecency with a child by sexual contact, a second-degree felony. *See* Tex. Penal Code Ann. § 21.11 (West Supp. 2010). A jury found Ozuna guilty of the offense. The trial court found the indictment's enhancement paragraph to be true and assessed punishment at life in prison. On appeal, Ozuna argues that (1) the indictment failed to give him adequate notice of the State's intent to use a prior conviction for enhancement purposes, (2) the evidence was legally insufficient to support a true finding as to the enhancement paragraph, and (3) the trial court erred in admitting an involuntary confession into evidence. We affirm the judgment of the trial court.

## BACKGROUND

Ozuna's indictment for indecency with a child by sexual contact stemmed from allegations by his step-daughter, M.R., that he touched her genitals with his hands. The indictment contained the following enhancement paragraph:

And, the Grand Jurors upon their oaths further present that prior to the commission of the offense in paragraph one, DANIEL OZUNA, on the 29th day of January, 1997, in the District Court of Adams County, Nebraska, in Cause Number 96546 styled THE STATE OF NEBRASKA vs. DANIEL OZUNA, was legally and finally convicted of Ct I-Assault by Confined Person  Ct-II Robbery, a felony, upon a charging instrument then pending in the Court and of which that Court had jurisdiction[.]

A jury trial was held on this charge and similar charges committed against M.R.'s two younger siblings, J.R. and T.O.  The jury heard testimony from several witnesses, including the victims, Ozuna, and two San Angelo Police Department detectives.[1]  During the testimony of Detective Irma Rodriguez, the State offered a video recording of an interview conducted by Rodriguez in which Ozuna confessed to touching M.R.  Ozuna objected to the admission of the video recording on the grounds that it was an involuntary confession.  A hearing was held outside the presence of the jury to determine the admissibility of the video.

At the hearing, Ozuna offered recordings of three interviews performed over a 60-day period from March to May 2009.  Ozuna's confession occurred during the third interview.  Ozuna testified at the hearing that Detective John Ford, who conducted the first and second interviews, stated that he could give Ozuna "the lightest punishment he can, it would either be probation or classes, and he told [Ozuna] he would talk to the DA and try to get as less punishment as he can."  Ozuna also claimed that Ford told him that if he confessed to the count against M.R., he would be able to see his children again and Ford would "drop" the prosecution for the other two siblings.  At the conclusion of the hearing, the trial judge overruled Ozuna's objection and found that Ozuna

_____

[1] The victims' mother (who was also Ozuna's estranged wife), their current foster parents, and several caseworkers also testified.

2

freely, knowingly, intelligently, and voluntarily waived his rights and gave the statement. The third interview was then played to the jury.

At the conclusion of trial, the jury found Ozuna guilty of one count of indecency with a child by sexual contact against M.R. and acquitted him of all charges against M.R.'s siblings. During the punishment phase, Ozuna pleaded "not true" to the indictment's enhancement paragraph. The State presented punishment evidence in the form of a Nebraska penitentiary packet and several Texas penitentiary packets. The trial court found that the enhancement paragraph was true, and sentenced Ozuna to life imprisonment.[2] The trial court later denied Ozuna's motion for new trial and motion to set aside a void sentence. This appeal followed.

## DISCUSSION

Ozuna raises three issues on appeal. First, he claims that the indictment failed to give him constitutionally adequate notice of the State's intent to enhance his conviction. Second, Ozuna argues that the evidence was legally insufficient to support a true finding as to the enhancement paragraph of the indictment. Finally, Ozuna contends that the trial court erred in admitting the third interview because the interview included an involuntary confession.

---

[2] The charged offense, indecency with a child by sexual contact, is a second-degree felony punishable by two to twenty years' imprisonment. *See* Tex. Penal Code Ann. §§ 12.33, 21.11 (West Supp. 2010). A second-degree felony may be enhanced to a first-degree felony by proving that the defendant has been once before convicted of a felony. *See id.* § 12.42(b) (West Supp. 2010). A first-degree felony has a punishment range of five to ninety-nine years or life. *See id.* § 12.32 (West Supp. 2010).

**Notice of Enhancement**

In his first issue on appeal, Ozuna argues that the indictment failed to give constitutionally adequate notice of the State's intent to use the prior conviction of assault by a confined person for enhancement purposes. We review this question of law de novo. *See Smith v. State*, 309 S.W.3d 10, 13 (Tex. Crim. App. 2010) ("The sufficiency of a charging instrument presents a question of law.").

The indictment's second paragraph states:

> [P]rior to the commission of the offense in paragraph one, Daniel Ozuna, on the 29th day of January 1997, in the District Court of Adams County, Nebraska, in Cause Number 96546 styled THE STATE OF NEBRASKA vs. DANIEL OZUNA, was legally and finally convicted of Ct I-Assault by a Confined Person  Ct II-Robbery, a felony[.]

The Nebraska penitentiary packet introduced to prove these convictions indicates that count two, robbery, was dismissed. Therefore, in order for the State to properly enhance Ozuna's conviction, it was required to prove the conviction for count one, assault by a confined person. Ozuna asserts that the indictment failed to adequately notify him of the State's intent to use the assault conviction for enhancement because the words "a felony" in the indictment modify the robbery count but not the count for assault by a confined person. He claims that it is "illogical" to contend that merely including a conviction in an indictment, without identifying it as a felony, notifies a defendant of the State's intent to use that conviction for enhancement purposes. We disagree.

If a defendant does not object to a defect in the indictment before trial, he "waives and forfeits" the right to object on appeal or at any post-conviction proceeding. *See* Tex. Code Crim.

4

Proc. Ann. art. 1.14(b) (West 2005); *Sanchez v. State*, 120 S.W.3d 359, 364 (Tex. Crim. App. 2003). The record does not reflect that Ozuna objected to the indictment at any time prior to this appeal.

However, even had Ozuna properly objected, the alleged error does not vitiate the notice received by Ozuna. A defendant is entitled to an enhancement allegation that will enable him to locate the record of the prior conviction alleged and prepare to meet the question of whether he is the same person who was convicted in the earlier case. *Villescas v. State*, 189 S.W.3d 290, 293 (Tex. Crim. App. 2006). The enhancement paragraph in this case alleged the nature of the offense and the date, county, court, style, and cause number of the conviction for assault by a confined person. Given the specificity of the information provided in the indictment, we conclude that it provided Ozuna with sufficient information to notify him of the State's intent to use the conviction for enhancement and to allow him to locate the record and prepare a defense against it. *See Pelache v. State*, 324 S.W.3d 568, 577 (Tex. Crim. App. 2010) ("The issue is whether appellant received sufficient notice . . . so that he had the opportunity to prepare a defense . . . ."). We overrule Ozuna's first point on appeal.

**Legal Sufficiency**

Ozuna next argues that the Nebraska penitentiary packet introduced to prove the prior conviction for assault by a confined person did not contain legally sufficient evidence to support the trial court's finding of "true" as to that conviction. In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could make the finding beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 908 (Tex. Crim. App. 2010); *Young v. State*, 283 S.W.3d 854, 863 (Tex. Crim. App. 2009).

To prove a prior conviction, a penitentiary packet must contain sufficient information to establish both the existence of a prior conviction and the defendant's identity as the person convicted. *See Flowers v. State*, 220 S.W.3d 919, 922 (Tex. Crim. App. 2007). The Nebraska penitentiary packet did not contain a copy of the judgment finding Ozuna guilty, but it did contain a commitment order in cause number 96546 stating Ozuna's name, the offense, date of sentence, length of sentence, sentencing court, and county of conviction. It also contained a sentencing order in cause number 96546, dated January 29, 1997, and signed by a trial judge, sentencing Ozuna to serve one year in the Nebraska Department of Corrections.

Ozuna argues that the penitentiary packet never identified assault by a confined person as a felony conviction, an element the State was required to prove. Felony convictions rendered by the courts of other states may be used to enhance punishment. *See, e.g.*, *Langston v. State*, 776 S.W.2d 586, 588-89 (Tex. Crim. App. 1989). If, as here, the trial court does not take judicial notice of the laws of the other state, it is presumed that the law of that state is the same as Texas. *Id.* at 588. While Texas law does not provide for the crime of "assault by a confined person," the Texas Penal Code defines a felony as "an offense so designated by law or punishable by death or confinement in a penitentiary." Tex. Penal Code Ann. § 1.07(a)(23) (West Supp. 2010). Ozuna's punishment for assault by a confined person consisted of a one-year sentence in the Nebraska Corrections Department. The commitment order called for commitment to the Nebraska Penal and Correctional Complex, a penitentiary. Because Ozuna was sentenced to time in a penitentiary, his conviction for assault by a confined person was a felony under Texas law. *See Brooks v. State*, 642 S.W.2d 791, 798 (Tex. Crim. App. 1982) (concluding that Nebraska conviction involving

sentence of two years in Nebraska Penal and Correctional Complex was felony offense because it met Texas definition for "felony"). Because the Nebraska penitentiary packet contained sufficient proof to establish the existence of a prior conviction for assault by a confined person, an offense classified as a felony under Texas law, and Ozuna's identity as the person convicted, we conclude that a rational trier of fact could have found beyond a reasonable doubt that the enhancement paragraph contained in the indictment was "true" as to Ozuna's conviction for assault by a confined person.[3] Ozuna's second point on appeal is overruled.

**Involuntary Statement**

In his final point on appeal, Ozuna claims that the trial court erred in admitting the video recording containing his confession. He asserts that the interview contained an involuntary confession in violation of the Fifth and Fourteenth Amendments of the United States Constitution and the Texas Code of Criminal Procedure. *See* U.S. Const. amend. V; *id.* amend. XIV; Tex. Code Crim. Proc. Ann. art. 38.21 (West 2005). Ordinarily, we review the trial court's ruling regarding the voluntariness of a statement under an abuse-of-discretion standard, viewing the evidence in the light most favorable to the trial court's ruling, *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996), and deferring to the trial court as the exclusive factfinder and judge of the credibility of the witnesses, *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). However, when, as here, there is a videotape of the confession and an uncontroverted version of the events surrounding

---

[3] Ozuna also admitted to the previous conviction when, during the guilt-innocence phase of trial, he testified that he had previously served time in jail for the felony offense "aggravated assault of an officer" in Nebraska. At the punishment hearing, the trial court took judicial notice of all evidence presented during guilt-innocence.

it, we review de novo the trial court's ruling on the application of law to facts. *See Oles v. State*, 993 S.W.2d 103, 105 (Tex. Crim. App. 1999) (reviewing motion to suppress de novo when there is question of law with no disputed facts); *Herrera v. State*, 194 S.W.3d 656, 658 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (reviewing voluntariness of videotaped confession de novo). The determination of whether a confession is voluntary is based on an examination of the totality of the circumstances surrounding its acquisition. *See Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991); *Wyatt v. State*, 23 S.W.3d 18, 23 (Tex. Crim. App. 2000).

Ozuna contends that Detective Ford, who conducted the first two interviews, and Detective Rodriguez, who conducted the third interview, made implied promises that if Ozuna confessed to touching M.R., he would be able to see his children and the additional prosecutions against him would be dismissed. We will first outline what occurred during the interviews before analyzing them for infringement of Ozuna's rights under the Constitution and the code of criminal procedure.

*The Interviews*

The first interview began with Ozuna signing a written waiver of his *Miranda* rights.[4] Ford and Ozuna then discussed the results of Ozuna's recent polygraph tests. Ford explained to Ozuna that he showed "deception indicated" on the polygraph as to M.R.'s allegations, but passed the polygraph regarding M.R.'s sister, J.R. Ford explained, "[T]he first [test, J.R.,] you passed. I am willing to give you that one because you did. . . . I said from the get go that I don't know what

---

[4] *See Miranda v. Arizona*, 384 U.S. 436 (1966) (holding that prior to custodial interrogation, defendant must be warned of his rights under Fifth Amendment).

8

the polygraph's going to show, but I'll take it whatever it is." Ford went on to discuss how honesty might help Ozuna gain access to his children, saying,

> What I want to do is . . . I want to see you get, and be able to deal with, your children. Be able to talk to them. In order to do that, Daniel, . . . I've gotta be able to take honesty to the court, and say "look, he is being honest, he wants to rebuild. He wants to change. This isn't who he is, he is not this kind of person, and he doesn't want his daughter to go through this crap anymore. He [doesn't] want her to suffer." But I can't start off with, "ok yeah, this one I passed, and this one I failed." That's the problem.

Later in the interview, during an explanation of the difference between sexual assault and indecency with a child, Ford explained, "This is an indecency with a child case, and there was touching that went on that was inappropriate, and that's the kind of case we can work with in reuniting families and getting them back together." Throughout the interview, Ozuna denied touching M.R. or her siblings and repeatedly insisted that he did not fail the polygraph. At the end of the interview, Ford explained that even though the district attorney would "give" him J.R., they were still "going to have issues" with M.R. because he failed the polygraph as to her.

Three minutes of the second interview were played during the hearing.[5] During those three minutes, Ozuna and Ford discussed what might happen if another polygraph about M.R. came back with "deception indicated." Ford asked Ozuna, "What am I supposed to do if it comes back and shows 'deception indicated'? Then I have to go to my boss, then I have to go to my sergeant, who has to go to his boss, who has to go to the D.A.'s office and say, 'Look, he's a liar. Maybe we

---

[5] These three minutes were taken from the middle of the interview and did not include the reading or waiver of *Miranda* rights.

need to go back and look at every kid that has been involved in his life.' . . . I just don't know what I'm supposed to do if it comes back 'deception indicated.'" Ford went on to say, "I think I can get rid of the [T.O.] case . . . as a matter of fact I know I can."[6] Ford then stated that the "[M.R.] thing is going to be the hold up" and again asked, "What am I supposed to do if it comes back 'deception indicated'?" Ford explained that he would have to tell his sergeant that after giving Ozuna several chances, Ozuna still showed deception on his polygraph tests. Ford then compared this "deception indicated" scenario with one in which Ozuna was "willing to admit it," in which case Ford could report to his boss that Ozuna "can move on, get counseling, get help, because his kids are the most important thing."

During the third interview, in which Ozuna again signed a waiver of his *Miranda* rights, Rodriguez, who conducted the interview, stated, "I don't believe this happened more than one time. I think it's like [M.R.] says, all he did was he touched, you touched her, but that needs to come out." Rodriguez then went on to say:

> You mentioned counseling. I am mentioning counseling. And I think that's what you're gonna need, you know for this to get resolved, so you can come back home to your family. But you may not be able to get around [M.R.] and [J.R.] for a little while. But I think that once you are able to show that you're safe around them—and that's gonna be proved by counseling—that's when you're gonna be able to be with your family.

---

[6] Ford explained that this was because the allegations as to T.O. allegedly occurred on a trampoline, but Ozuna was incarcerated during the time period that the children had access to a trampoline.

Ozuna then stated that he was afraid of remaining in jail, but admitted, "I touched [M.R.] I did. . . . It was something I regret in my life."

*Constitutional Due Process*

A statement is involuntary for purposes of federal due process only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker. *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995) (citing *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)). Absent coercive police conduct causally related to the confession, there is no basis for a due-process claim. *Id*.

Ozuna argues that Ford's comments during the first and second interviews created an implied promise that if he confessed to touching M.R., the cases involving J.R. and T.O. would be dismissed, and that they would not be dismissed if he did not confess. He also claims that Ford and Rodriguez made an implied promise that he would "get his children back" if he confessed. We disagree with this characterization of the interviews.

The first interview contained no statement that, when viewed in context, could reasonably be construed as police coercion. Ford's first statement, that he would "give" Ozuna J.R., was not a promise to prevent prosecution. Instead, it was Ford communicating his belief that Ozuna may be telling the truth as to J.R.'s allegations. His statement that the district attorney would "give" Ozuna J.R. was made in an attempt to explain that, even if the prosecution for J.R.'s allegations ceased, Ozuna would still have to defend against M.R.'s allegations before he could see his children again. To the extent that this statement may be construed as a promise, the existence of a promise

11

is only one factor in the determination of voluntariness, and does not render a confession involuntary per se. *Hawkins v. Lynaugh*, 844 F.2d 1132, 1140 (5th Cir. 1988). When viewed in the context of the totality of the circumstances, this statement, which was made nearly two months before Ozuna's confession, did not render the confession involuntary. *See id.* Ford's other comments during the first interview communicated the benefits of honesty and informed Ozuna that there was a greater possibility that Ozuna could be reunited with his children if he told the truth. Statements regarding the benefits of honesty do not render a confession involuntary. *See United States v. Craft*, 495 F.3d 259, 263-64 (6th Cir. 2007) (concluding that statement about possible leniency upon cooperation does not render confession unconstitutional); *Dykes v. State*, 657 S.W.2d 796, 797 (Tex. Crim. App. 1983) ("A confession is not rendered inadmissible because it is made after an accused has been told by the officer taking the confession that it would be best to tell the truth.").

Ford's statements in the second interview also showed no coercive conduct. Again, Ford explained the consequences of dishonesty versus honesty and the fact that honesty was in Ozuna's best interest. His statement that he could "get rid" of the T.O. case, when considered in context, did not imply a promise to do so in exchange for a confession. Rather, it was an attempt to make Ozuna understand that even if the T.O. and J.R. prosecutions were dropped, he would still face allegations by M.R. The circumstances surrounding this statement, including its context within the interview and the lack of temporal proximity to the confession, make it unlikely to have impacted the free and voluntary nature of Ozuna's confession.

Finally, Rodriguez's statements in the third interview did not impliedly promise Ozuna that he would "get his children back" if he confessed. Rather, Rodriguez's statements were

12

statements of fact, expressing the reality that Ozuna would need counseling if he ever wished to convince authorities to allow him access to his children. *See Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993) (declaring that statement of fact was not promise in exchange for confession). Reviewing Ford's and Rodriguez's statements in context, we see no conduct that would have made Ozuna's confession involuntary under federal due process.

*Texas Code of Criminal Procedure*

Under Texas law, a statement may be used in evidence against an accused if it appears that the statement was "freely and voluntarily made without compulsion or persuasion." Tex. Code Crim. Proc. Ann. art. 38.21. For a promise to render a confession invalid, it must be positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause a defendant to speak untruthfully. *Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004). General offers to help a defendant are not likely to induce an accused to make an untruthful statement, and therefore will not invalidate a confession. *Garcia v. State*, 919 S.W.2d 370, 388 (Tex. Crim. App. 1996) (citing *Dykes v. State*, 657 S.W.2d 796 (Tex. Crim. App. 1983)) (holding that detective's statement that he would try to "help [defendant] out" or would "talk to the D.A." were not specific promises). Similarly, general statements made to a suspect that a confession may sometimes result in leniency do not render a confession involuntary. *See Muniz*, 851 S.W.2d at 254.

The majority of Ford's and Rodriguez's statements were no more than general statements explaining how the truth could benefit Ozuna's chances of resolving the prosecutions. To the extent that any statements may be construed as promises, they were not conditioned on a confession and were therefore unlikely to induce Ozuna to speak untruthfully. *See Espinosa v. State*,

13

899 S.W.2d 359, 364 (Tex. App.—Houston [14th Dist.] 1995, pet. denied) ("Even specific, unequivocal promises can lack the persuasive impact needed to show that they will probably induce an accused to make an untruthful statement."). None of Ford's or Rodriguez's statements contained a promise or threat of such an influential nature that it would have caused Ozuna to speak untruthfully. We find this particularly true given the fact that the interviews occurred over a span of nearly two months. *See Wilson v. State*, 277 S.W.3d 446, 448 (Tex. App.—San Antonio 2008, no pet.) (considering temporal proximity of illegal conduct and confession when determining whether confession should be suppressed); *Perkins v. State*, 779 S.W.2d 918, 923 (Tex. App.—Dallas 1989, no pet.) (same).

Under the totality of the circumstances, we conclude that the confession was voluntary in nature. We overrule Ozuna's third point on appeal.

## CONCLUSION

Having overruled all of Ozuna's points on appeal, we affirm the trial court's judgment of conviction.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Henson and Goodwin

Affirmed

Filed: May 27, 2011

Do Not Publish

14