**Frank Andrew McCALL,**
**Petitioner–Appellant,**

v.

**Michael DUTTON and W.J. Michael**
**Cody, Respondents–Appellees.**

No. 88–5223.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 13, 1988.
Decided Dec. 15, 1988.

W.P. Boone Dougherty (argued), Harwell & Nichols, Knoxville, Tenn., for Frank Andrew McCall, petitioner-appellant.

Bettye Springfield–Carter, Asst. Atty. Gen., (argued), W.J. Michael Cody, Atty. Gen., Jerry Smith, Asst. Atty. Gen., Nashville, Tenn., for Michael Dutton and W.J. Michael Cody, respondents-appellees.

Before KRUPANSKY and GUY, Circuit Judges, and MEREDITH, District Judge.[*]

KRUPANSKY, Circuit Judge.

The instant appeal reviews the denial of the petition of appellant Frank Andrew McCall (McCall) for a federal writ of habeas corpus under 28 U.S.C. § 2254. McCall timely appealed the decision of the district court. McCall was convicted of first degree murder and possession of cocaine with intent to re-sell by a jury in the criminal court for Roane County, Tennessee. McCall received a life sentence with an additional 8–year sentence to run consecutively, subsequent to a trial on the murder and cocaine charges that commenced on August 30, 1983.

McCall charged upon appeal to the state appellate court that the trial court erred in admitting into evidence the statements he made to officers at the scene of his arrest and at the hospital subsequent to being placed into custody. The state appellate court initially decided that the issue was waived because of appellant's failure to provide a complete record of the hearing addressing his motions to suppress conducted before the trial court. However, the appellate court, upon reconsideration,

[*] The Honorable Ronald E. Meredith, United States District Court for the Western District of Kentucky, sitting by designation.

permitted the record to be supplemented, and ruled on the merits of appellant's motion. After the record had been supplemented, the state appellate court affirmed the lower court's refusal to suppress the controversial statements. Appellant then filed for permission to appeal to the Tennessee Supreme Court. That petition was denied on September 30, 1985.

The instant petition for a writ of habeas corpus was filed in federal court on March 27, 1986. On October 15, 1986, the district court adopted the report of the magistrate to whom the case had been referred and ordered the state to afford the petitioner an evidentiary hearing on the issue of the voluntariness of his oral statements, or a new trial, because it concluded that the suppression hearing that had been conducted at the state trial level had not satisfied constitutional standards.

On March 9–10, 1987, the Tennessee court system afforded appellant a new hearing. In an order entered on May 5, 1987, the criminal court of Roane County concluded that appellant's statements were voluntary.

On July 10, 1987, the petitioner filed a brief and memorandum in the federal district court and again requested that the petition for habeas corpus be granted, contending, *inter alia*, that, despite the state court's rulings, the oral statements were involuntary and should have been suppressed. On September 9, 1987, the magistrate found that a number of the statements used against petitioner at trial had been involuntary. The magistrate requested additional briefs to determine the prejudicial effect, if any, of the statements that he had characterized as involuntary. On October 28, 1987, the magistrate presented his report and recommendation wherein he determined that the admission of the involuntary statements constituted clear error and recommended that the petition for the writ of habeas corpus be granted.

After hearing the objections of the State of Tennessee to the magistrate's report, the district court, on December 8, 1987, issued a memorandum opinion and order which rejected the magistrate's report.

The district court denied McCall's habeas corpus petition, subsequent to which McCall filed this timely instant appeal.

Petitioner, a 35–year old male, had received a degree in education from the University of Tennessee. He had taught school for a year and attended graduate school, seeking a degree in psychology. On March 15, 1983, McCall was involved in a confrontation with Roane County Deputy Sheriff Dennis Armes (Armes). As a result of the confrontation, Armes was shot and killed. During the encounter, Armes fired five shots from his weapon, striking McCall in the left lung, groin, chest, and on the side of the head. Several hours later the appellant was apprehended in another county at a location called Frazier's Grocery.

Before arriving at Frazier's Grocery, McCall had driven his automobile to the store/residence of Sarah Carter in Meigs County, Tennessee several miles from the scene of the shooting. McCall had "blood all over his face and head," according to Carter. He demanded that he be admitted into her house, which Carter refused. After she refused, McCall drove several miles on a winding road, without incident, to the house of 76–year old Joseph Gunter in McMinn County, Tennessee. Gunter assisted McCall into his (Gunter's) house and permitted McCall to make several phone calls. However, when McCall was unable to establish telephone contact with the individuals that he phoned, he used a pair of scissors and proceeded to threaten Gunter "to drive me to Etowah or I'm going to stab you in the stomach with these scissors." Gunter attempted to retrieve the scissors from McCall who rebuffed the effort, whereupon Gunter, at gunpoint, forced McCall to drop the scissors. McCall then fell to the floor, apparently unconscious.

Gunter left the scene to summon assistance from a nearby resident. Receiving no response from his neighbor, he returned to his mobile home and found McCall on the ground outside Gunter's mobile home. Gunter returned to the mobile home and dialed the police telephone number. As Gunter was dialing, McCall burst into the

mobile home and forcibly took the phone from Gunter and terminated the call. At that point, Gunter's son (Harold Gunter) arrived. At McCall's request, Harold Gunter called a woman in Etowah, Tennessee who requested Gunter to determine the name and identity of the individual who requested him (Gunter) to place the call. For the first time, McCall disclosed his name and conversed with the recipient of the call in a rough manner. The phone thereupon went dead. McCall remained on the floor of the mobile home, where he had fallen, until police assistance arrived.

Officers Steve Hixon (Hixon), Jon French (French), Jesse Brooks (Brooks), Paul Jarnigan (Jarnigan), David Haggard (Haggard), Darrell Sirmans (Sirmans), Bryan Farmer (Farmer), and Sheriff R.L. McKenzie (McKenzie), arrived at the scene shortly after the Gunters requested police assistance. Several of these officers removed McCall from the mobile home and placed him on the ground in front of Frazier's Grocery, which was adjacent to the mobile home. He was searched and handcuffed. During this time, McCall was complaining of pain. Four or five officers who circled McCall interrogated him. A number of the officers had their guns drawn. Officer Brooks testified that it was standard procedure to have guns unholstered and pointed at a dangerous felony suspect, especially under the circumstances in the instant case. However, Officer Sirmans testified that, although revolvers were unholstered, they were not pointed directly at McCall. Similarly, Officer Farmer testified that revolvers, although unholstered, were not pointed directly at McCall.

Before any interrogation had been undertaken, Officer Hixon advised McCall of his *Miranda* rights. When queried if he understood those rights, McCall replied, "yes."

Brooks testified that McCall "passed out and came to" three or four times," but may have been closing his eyes to avoid conversation. Similarly, Officer Jarnigan described McCall as "trying to go to sleep" and "closing his eyes." However, Officer French testified that "he [McCall] was coherent." In the suppression hearing, Officer Farmer testified that defendant was conscious, answering questions, and his eyes were open. Farmer described defendant as "conscious at all times, it appeared."

The circumstances surrounding the confession notwithstanding, it is uncontroverted that McCall consistently and emphatically stated, in response to police interrogation, that a man named Dotson had shot the police officer. McCall refused to admit that he had shot Armes. He (McCall) stated that there was a gun in a ditch near the shooting scene. Subsequent to describing the gun as a silver-nickel pistol, McCall also claimed that the money that had been found on his person was his own and not stolen.

Within fifteen minutes after the arrival of the law enforcement authorities, an ambulance arrived at Frazier's Grocery and conveyed McCall to Sweetwater Hospital. Officer Farmer accompanied McCall on the trip. Farmer continued to question McCall concerning the identity of the individuals who had accompanied him and the whereabouts of the gun that had been used at the shootout. McCall persisted in denying the actual shooting of Officer Armes, stating that Dotson had shot Armes and that the gun had been thrown into an embankment at the shooting scene. Farmer further testified that at the hospital McCall changed his story by stating that he had thrown the gun from the vehicle along the highway while fleeing the scene of the shootout.

McCall's hospital records disclosed that he was lethargic and his condition was described as "serious" upon arrival. Additionally, it was discovered that McCall had ingested cocaine, a "quaalude," and a beer at some point prior to the time of his admission.

Several days after McCall had been admitted to Sweetwater Hospital, he was transferred to the University of Tennessee Medical Center. At the University Hospital, McCall made oral statements to Officer Hixon that tracked those he had made earlier at Frazier's Grocery and during the trip to Sweetwater Hospital. However, the

district court concluded that Officer Hixon had neglected to administer a valid *Miranda* warning prior to the University Hospital interrogation. The district court determined that the admission of the statements given at University Hospital constituted harmless error. On appeal, neither the state nor McCall challenged the district court's decision concerning those statements.

The federal district court ordered a new hearing before the state court at the conclusion of the first federal habeas corpus proceeding on October 15, 1986, the State of Tennessee proceeded to conduct the required evidentiary hearing, and arrived at the following decision:

From all of the testimony in the record of the case, this court finds that Frank McCall was wounded in the leg, groin, chest and head, but that it is apparent he knew his circumstances and was capable of exercising a rational intellect and a free will. Mr. McCall drove his automobile several miles on a two lane, curvy, rural road thereby placing distance between himself and the scene of the shooting. He did not collide with any other motorist nor any roadside fence, ditch, utility pole, etc. He left the home of Sarah Carter when she would not let him in, but had announced she would call help for him. It is clear that his purpose was to get help from friends in Etowah and avoid police contact. Mr. McCall drove several more miles to Mr. Gunter's residence in an adjoining county and his conduct with Mr. Gunter causes this Court to conclude that he was exercising his rational intellect and his free will. His cognitive abilities were still not significantly impaired. He was not abused by authorities who read his Miranda Warnings from a card and to which Mr. McCall said he understood. The Court finds no police overreaching under the circumstances of this case. Frank McCall is a well educated man with a history of being an athlete, who apparently comes from a middle-class family background.

The federal district court in the instant case made specific findings with regard to the conduct of the police officers and agreed with the state court that petitioner's confessions were voluntary. The principal district court findings included the following:

The evidence showed that Officer Hixon read petitioner his "Miranda" rights immediately upon arriving at the scene. The evidence supports a finding that although petitioner was seriously injured he was conscious and alert during the time that he was being interrogated.... The petitioner was able to flee the scene of the shooting in his car, stop to call for help on two occasions, make a phone call and threaten an elderly man with a pair of scissors.

It is true that petitioner fell many times while he was fleeing. However, this does not mean that he was unconscious each time that he fell. The court notes that petitioner had a serious leg injury at the time.

\*    \*    \*    \*    \*    \*

Specifically with respect to "coercive police activity," *see Connelly,* 107 S.Ct. at 522, the evidence of overreaching on the part of the police appears to be that there were many officers present, that some were angry and yelling questions at petitioner, and that several officers had rifles or handguns drawn. There was conflicting evidence on the question of whether questions were "yelled" at petitioner.... Testimony and photographs indicated that several officers were carrying rifles or carbines at the time of the interrogation. Testimony was conflicting but also indicated that some officers had drawn pistols at least at some point. However, there is no clear evidence in the record that any of these weapons were ever pointed at the petitioner. Certainly there was no evidence that the officers used these weapons in any way to force a "confession" out of the petitioner.

Upon this court's review of the evidence, it is clear that petitioner was in an injured and weakened state at the time of his arrest and interrogation. However,

this court cannot find the "coercive police activity" that is a "necessary predicate" to a finding that petitioner's statements taken immediately after his arrest were not voluntary within the meaning of the due process clause.

█ This court must presume that state court subsidiary findings of historical fact are correct. *See* 28 U.S.C. § 2254(d). *See also Cooper v. Scroggy,* 845 F.2d 1385, 1392 (6th Cir.1988). Moreover, the district court's findings of fact in habeas cases are subject to the clearly erroneous standard of review. *See Blackburn v. Foltz,* 828 F.2d 1177, 1181 (6th Cir.1987); *Ray v. Rose,* 535 F.2d 966, 973 n. 9 (6th Cir.1976). Deference to lower court's findings is especially warranted in cases where the critical evidence is testimonial. *United States v. Wolf,* 813 F.2d 970, 975 (9th Cir.1987).

█ The test for voluntariness of a confession involves three factors. Threshold to the determination that a confession was "involuntary" for due process purposes is the requirement that the police "extorted [the confession] from the accused by means of coercive activity." *See United States v. Rohrbach,* 813 F.2d 142, 144 (8th Cir.1987) (citing *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986)). Once it is established that the police activity was objectively coercive, it is necessary to examine petitioner's subjective state of mind to determine whether the "coercion" in question was sufficient to overbear the will of the accused. *Rohrbach,* 813 F.2d at 144. Finally, petitioner must prove that his will was overborne *because* of the coercive police activity in question. If the police misconduct at issue was not the "crucial motivating factor" behind petitioner's decision to confess, the confession may not be suppressed. *See Connelly,* 107 S.Ct. at 520; *Green v. Scully,* 850 F.2d 894, 903–04 (2d Cir.1988) (where defendant confessed because he was afraid he would harm others and not because of police misconduct, confession not suppressed); *Hawkins v. Lynaugh,* 844 F.2d 1132, 1140 (5th Cir. 1988) (despite length of police interrogation, petitioner confessed because he decided to "get it over with" rather than as a

result of coercion; accordingly confession ruled "voluntary"); *Rohrbach,* 813 F.2d at 145 n. 1 (denying petition for habeas corpus because petitioner did not show any "causal nexus" between alleged police misconduct and confession).

In the case at bar, the district court based its decision solely on the first prong of this three-part test. The court acknowledged that petitioner was in an "injured and weakened state at the time of his arrest and interrogation." However, the Court decided that consideration of defendant's mental state was unnecessary because McCall failed to surmount the preliminary hurdle of showing "coercive police activity."

█ Mindful of the foregoing standards of review, this court cannot conclude that the district court's factual findings were clearly erroneous. Accordingly, this court agrees that there was no "coercive police activity" in this case. Moreover, this court would affirm on either of the two remaining prongs of the three-part test. In the case at bar, the petitioner's mental state was not so weak that it was overborne by the asserted "coercion." Nor did defendant establish the requisite causation between the police conduct and petitioner's confession.

Petitioner charged that the police conduct was coercive because he had been handcuffed, placed on the ground, and surrounded by numerous police officers who "yelled" and pointed weapons at him.

However, the district court correctly found that there was "no evidence that the officers used these weapons in any way to force a 'confession' out of the petitioner." Indeed, with the exception of Officer Brooks, no other police officer testified that any guns were leveled directly at petitioner. Moreover, petitioner failed to introduce evidence to support his assertion that any activity that occurred at the time of his apprehension and immediately thereafter intimidated him in any way or coerced him to make the controversial statements.

At any rate, it was uncontroverted that the display of weapons was not intended to

"extort" a confession by coercive means. *See Rohrbach,* 813 F.2d at 145 (statement cannot be involuntary unless extorted from accused by coercive means). Instead, as Officer Brooks testified, the weapons were carried as a "protective measure" employed against a dangerous fleeing felon who had recently killed a fellow police officer. Because petitioner offered no evidence to prove that this explanation was pretextual, this Court concludes that the display of weapons was not unwarranted and did not constitute police overreaching. Accordingly, in the absence of proof of improper police behavior, the mere display of weapons does not justify suppression of petitioner's statements. *Cf. Cooper v. Scroggy,* 845 F.2d 1385, 1392 (6th Cir.1988) (deterrence of police overreaching is a major purpose underlying the exclusion of involuntary confessions).

Nor did plaintiff demonstrate that the confusion and shouting that prevailed at the scene at Frazier's Grocery was coercive. Moreover, it is well-recognized that "mere emotionalism and confusion" at Frazier's Grocery did not by itself constitute police coercion. *See Hawkins v. Lynaugh,* 844 F.2d at 1140 ("[n]either mere 'emotionalism and confusion,' nor mere 'trickery' will alone necessarily invalidate a confession") (citing *Corn v. Zant,* 708 F.2d 549, 567 (11th Cir.1983), *cert. denied,* 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984)).

McCall also contended that he had received no *Miranda* warnings. He correctly stated that the "absence of *Miranda* warnings is one factor to be considered in assessing the voluntariness of a confession." *United States v. Pelton,* 835 F.2d 1067, 1072 (4th Cir.1987) (citing *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966)). However, in the case at bar, Officer French explicitly testified that McCall had been read his rights and had responded "yes" when requested to acknowledge his understanding of his rights. This court is constrained to uphold the district court and state court decisions to credit French's testimony and this court must conclude that McCall was properly read his *Miranda* rights.

In short, after a review of the applicable sections of the transcript, this court concurs with the district court's finding that no "police coercion" occurred. This finding alone should end the inquiry because proof of police coercion is a threshold requirement for petitioner's claim.

■ This court also notes, however, that even if petitioner had proved police coercion, he would still not prevail because the alleged "coercion" was simply insufficient to overbear the will of the accused. It is uncontroverted that McCall was a college graduate with some graduate school experience. *See Pelton,* 835 F.2d at 1073 (finding that petitioner was an educated man tends to support a finding that petitioner's will was not overborne). It is also undisputed that shortly before the instant interrogation, McCall had demonstrated his mental acuity by driving a number of miles on a winding road, by threatening both Sarah Carter and Joseph Gunter, and by placing several coherent telephone calls for assistance. Additionally, McCall affirmatively responded that he understood his *Miranda* rights. Officer French testified that McCall "seemed to be coherent," and Officer Farmer claimed that McCall was "conscious, answering questions, and his eyes were open." *See Rohrbach,* 813 F.2d at 145 (rejecting claim of involuntary confession where, *inter alia,* federal agents testified that petitioner was "lucid and able to communicate" at the time of the interrogation). Finally, it is noteworthy that McCall's denials were consistently exculpatory and he persistently identified "Dotson" as the individual who shot and killed Officer Armes. *Cf. Pelton,* 835 F.2d at 1073 (where, *inter alia,* defendant "refused to give certain information" because he believed that information could harm him, defendant's statements not involuntary).

In view of the totality of the circumstances, this court cannot support a conclusion that McCall's mental state was so weakened that his will was overborne. On the contrary, McCall was "coherent," capable of threatening innocent bystanders, and able to understand the consequences of his

statements. Even if the police activity was "coercive," petitioner's mental state was strong enough to withstand the alleged coercion.

In the view of this court, McCall also failed to prove the third necessary element to support his claim, namely that the alleged police coercion was causally connected to the confession. *See Connelly*, 107 S.Ct. at 521. This court is not authorized to conduct "sweeping inquiries into the state of mind of a criminal defendant who has confessed, inquiries quite divorced from any coercion brought to bear on the defendant by the state." *Id.*

In the instant case, McCall did not testify that he confessed *because* of the coercive conduct of the police. Indeed, McCall testified that he did not remember the questions. He testified that he "blanked out" a number of times, and did not have clear recollections of the confession scene. Accordingly, if McCall's confession was a product of his own incoherent state of mind, rather than a product of police coercion, the confession should not be suppressed. *See Green v. Scully*, 850 F.2d at 903–04. (Confession not suppressed because police misconduct was not "crucial motivating factor" behind confession; defendant confessed because he was afraid he would harm others, not because of police misconduct). *See also Rohrbach*, 813 F.2d at 145 n. 1 (establishing "causal nexus" requirement).

Accordingly, petitioner has failed to satisfy the standards articulated by existing legal precedent necessary to support his petition for habeas corpus relief. The decision below is AFFIRMED.[1]

---

**1.** Affirmance might have been possible on a harmless error rationale. Petitioner's statements, like those in *Miller v. Dugger*, 838 F.2d 1530 at 1546, "did not really constitute a confession" and might have been harmless. *Id.* However, this court need not reach this issue which was not briefed by the parties.