UNITED STATES of America, Plaintiff,

v.

Carlton McEADDY, Defendant.

No. 91–80471.

United States District Court,
E.D. Michigan, S.D.

Dec. 12, 1991.

Edward Ewell, U.S. Atty., Detroit, Mich., for plaintiff.

Paul D. Borman, Federal Defender, Detroit, Mich., for defendant.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SEVER AND DENYING DEFENDANT'S MOTION TO SUPPRESS

ROSEN, District Judge.

### INTRODUCTION

This matter is before the Court on a series of motions filed by Defendant Carlton McEaddy ("Defendant"). They are as follows: motion to suppress statements; motion to sever defendants/offenses; discovery motions; and motion for Government agents to retain rough notes.

The Court scheduled oral argument on these motions for November 1, 1991. At a pre-hearing conference, the Court informed the parties that it had decided to sever the defendants Carlton McEaddy and Joe Fountain and would therefore sever Count VI from the rest of the indictment.[1] Further, at the close of the hearing, the parties resolved all disputed discovery matters as well as the question of retention of rough notes. Therefore, this Opinion addresses only the Defendant's motion to suppress.

### FACTS

At the hearing on the motion to suppress, the Government called as witnesses Special Agent Michael Yott and Special Agent Roger Guthrie, both of the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). The testimony of the agents was consistent. On June 4, 1991, pursuant to a valid search warrant, they, along with case agent, Anthony Primac, and other agents, executed a search of a residence located at 14272 Mayfield. The agents were authorized by the warrant to search for firearms, drugs, and drug paraphernalia.

After a forced entry, the agents conducted a protective sweep of the residence and gathered the four occupants into the living room area, handcuffed them, and forced them to lie face downward on the floor. At this time, Agent Primac read the occupants their rights from a card, pausing periodically to allow each occupant to express his consent and understanding. Agent Yott then asked the occupants whether there were any valuables or firearms in the residence. This question received no response. With the occupants still handcuffed and detained in the living room, the agents then conducted a search of the premises. The agents found three firearms in a hall closet and controlled substances.

The four occupants were then taken individually into the dining room area, connected to the living room by an open doorway, and asked a series of questions. Agents Guthrie and Yott conducted this initial interview, the purpose of which was to establish whether there was a need further to detain any of the occupants. The agents did not in any way coerce the occupants to answer their questions.[2]

During this interview, Defendant identified himself by the alias Frank Davis and admitted that he was a paroled felon. He stated that he had handled the subject firearms, but that the firearms do not belong to him. At this point, the initial interview with the Defendant was terminated. No other occupant of the house admitted possession of the firearms.

After each of the occupants had been questioned in the dining room area, Agents Yott and Guthrie led the Defendant to a second floor bedroom so as to conduct a more thorough interview.[3] The Defen-

---

1. The Government did not oppose the Defendant's motion to sever.

2. In fact, one occupant refused to answer any questions.

3. According to the agents, they were searching for a more private place in which to conduct their questioning of the Defendant. The agents added that they chose the second floor because

dant's handcuffs were removed at this point and apparently remained so for the duration of the upstairs interview. According to the agents, the Defendant did not appear to be under the influence of any drug and was generally calm and cooperative. Moreover, the Defendant did not in any way indicate that he wished to refrain from answering questions or that he wanted an attorney present. There was no coercion of the Defendant, subtle or blatant.

Once upstairs, Agent Yott once again read the Defendant his Miranda rights. The Defendant then signed a Waiver of Right to Remain Silent and Right to Advice of Counsel form using the name Frank Davis.[4] Agents Yott, Guthrie, and Primac also signed the form as witnesses.[5] Agent Yott then took the Defendant's statement. In that statement, the Defendant claims that he had been staying at 14272 Mayfield for about two months. He says that he had loaded the .32 caliber pistol with six live rounds and that he had handled all the firearms. He had handled the .22 caliber rifle that day. He kept the firearms in the house for protection because there were a lot of people passing in and out of the house. He adds that he had not fired the guns, and concludes that guns are his hobby. The Defendant signed this statement using the name Frank Davis. Special Agents Guthrie and Yott also signed.

The Government rested and the defense called Gregory Jackson, one of the four occupants of the house at the time of the execution of the search warrant. Mr. Jackson testified as to the events surrounding the search. He claimed that he lay on the floor for approximately 30 to 60 minutes before he was taken upstairs where he was questioned by agents for about 20 minutes. He denied being questioned in the dining

room. Mr. Jackson stated that the agents may have informed him of his Miranda rights but he was not sure. He added that he had not been mistreated by the agents.

The Defendant then took the stand. He testified that he lives on Houston–Whittier street in Detroit and, on June 3, had been asked to come to Mr. Fountain's house the next day to cut the grass and clean the basement. On the morning of June 4, he arrived at the residence at approximately 10:00 a.m. At the time of the search, the agents apprehended him in the kitchen and told him to lie on the floor. After five minutes, he was taken to the dining room [6] where he joined the other occupants of the house and was told to lie on the floor face downward. He admitted having been read his Miranda rights and having been asked whether he understood those rights. The Defendant claimed that there had been no initial interview whether in the dining room or elsewhere, but rather that he had been tapped on the shoulder from his prone position and led upstairs.[7]

On direct examination, the Defendant was asked about his name. During the search, he volunteered his name as Frank Davis. He also used this name to sign the rights waiver and statement. Although the Defendant's testimony on this subject was convoluted, it appears that there had been an outstanding warrant for his arrest as of March 1987. Then, in December 1987, he was arrested on an unrelated drug charge. During the raid prior to this arrest, he found a wallet with a food stamp card belonging to a Frank Davis lying near him on the floor. He used this name at the time of the raid so the police would not know that there was an outstanding warrant for his arrest. Also, on cross-examination, he admitted to having a prior drug

the first floor rooms were cluttered or did not afford the requisite privacy.

4. The waiver and the Defendant's statement were appended to the Government's response to the Defendant's motion.

5. Agent Primac apparently signed the form later and did not actually witness the reading of the rights.

6. As noted above, the agents testified that they detained the occupants in the living room. It appears from the Defendant's testimony that he was unclear as to which room was the living room and which room was the dining room.

7. The Defendant maintained that the agents were not telling the truth about the initial questioning in the dining room.

conviction under the name Carlton McEaddy. He also admitted to having had a conviction approximately ten years prior for carrying a concealed weapon.

The Defendant claimed that the agents treated him well until he was taken upstairs. At that time, he was seated on the floor with his back to the wall. One agent was standing before him and the other was to his side. The Defendant answered some questions posed by Agent Yott. Agent Yott then transcribed the Defendant's answers in the form of a statement. Agent Guthrie, who had descended to the first floor for about three minutes, returned and told the Defendant to sign his statement. When the Defendant refused, the Defendant alleged that the agents punched and kicked him. To stop the abuse, he signed the statement and then the waiver. He did not mention this alleged beating to any person.

On cross-examination, the Defendant admitted that he had known at the time of his arrest that Joe Fountain is a felon and that it was a parole violation to be in contact with a convicted felon. He added that he did not know that Mr. Fountain was in possession of drugs or that the house was a drug house. He did say that he knew that the house had recently been raided for drugs. He also said that he did not know that there were firearms in the house and had never seen the firearms prior to the date of his arrest.

It is undisputed that the Defendant, from the time of his detention through his transportation to the custody of the marshals, was in the control of the agents and was not free to leave.

## DISCUSSION

### I. Credibility

■ The Court credits the testimony of Agents Guthrie and Yott. Both their direct examination and cross-examination testimony was, in all major respects, consistent. It is also supported by the rights waiver and the Defendant's statement. Moreover, the procedures as to which the agents testified appear to be those commonly used by the ATF and other law enforcement agencies.

The Court does not credit the testimony of the Defendant, which the Court found generally to be convoluted and evasive. The Defendant's credibility is particularly damaged by a number of inconsistent statements, as well as evidence of previous mendacity. For example, the Defendant testified that there had been no guns in the closet at the time of the previous raid of the house. However, if, as he claimed, he had not stayed at the house [8], it is unclear how he could have been so sure that there were no firearms in the closet during the prior raid. Further, the Defendant admitted on the stand to having lied to the agents about his name. When asked why he had not given his correct name, he answered that he had not been asked to give his true name and that "it's not nice to volunteer on everything." Finally, the Defendant steadfastly maintained he had never been asked a question about the drugs that were found—a highly unlikely fact in view of the fact that this was a drug raid.[9]

The account of his alleged beating is particularly difficult to credit. The Defendant states that he was initially handcuffed and seated on the floor. Then, after Agent Yott completed the statement, he was asked to sign it. When he refused, Agent Guthrie began to hit him in his side. When asked by the prosecutor how he could have been hit in this manner while seated with his back to the wall, he amended his testimony to add that after Agent Yott had completed the statement, he had risen and was standing. Agent Guthrie, he said, then told him to face the wall, at which point he was beaten.

Also suspicious is his testimony concerning his handcuffs. He claims to have been handcuffed during the beating. Yet, it would seem only logical for the agents to

---

**8.** As opposed to what he states in the written statement that he had lived there for two months.

**9.** Agent Yott testified that he had asked the Defendant about the narcotics found at the house.

have removed the handcuffs when they asked the Defendant to sign the waiver and statement—prior to the alleged beating. It seems doubtful that the agents would have asked the Defendant to sign a statement with his hands restrained behind his back.

Finally, the Defendant's reaction to the alleged beating is not credible. According to the Defendant, he knew that if he signed the statement, he would return to prison. He also stated that the alleged beating did not cause him a great deal of pain. Yet he signed what he knew to be an incriminating statement to stop allegedly harmless punches and kicks. He then failed to report the beating to the magistrate judge, pre-trial services, another agent, or a physician. Whether he told his attorney is unclear. At one point in his testimony, he said that he did not tell his attorney about the beating, but he subsequently contradicted himself by claiming that he did tell his attorney.

In sum, a review of the Defendant's testimony, aided by the Court's observation of the Defendant as he was testifying, convinces the Court that the Defendant's testimony is not credible. Therefore, to the extent that the Defendant's testimony is inconsistent with the testimony of the Agents Yott and Guthrie, the Court does not credit this testimony.

The Defendant's suppression motion is based upon two grounds: (1) that the written statement and waiver of rights were secured by coercion in violation of the Fifth Amendment; and (2) that his oral and written statements were the product of an unreasonably prolonged detention and illegal arrest in violation of the Fourth Amendment.[10] The Court will address each of these arguments in turn.

## II. Coerced Confession

The Defendant asks the Court to suppress his written statement on the ground that it was obtained as a result of coercive police tactics. Specifically, the Defendant testified at the evidentiary hearing that he was punched five times in his side by Agent Guthrie and kicked four times in his legs by Agent Yott because he refused to sign the written statement and waiver.[11] Hence, says the Defendant, even though he had been effectively Mirandized, the statement was not voluntary and should therefore be suppressed: "[T]he admission of a confession not obtained in violation of Miranda will still violate due process if the confession was given involuntarily." United States v. Murphy, 763 F.2d 202, 205 (6th Cir.1985), cert. denied, Stauffer v. United States, 474 U.S. 1063, 106 S.Ct. 812, 88 L.Ed.2d 786 (1986).

The Sixth Circuit has established a tripartite test for determining when a confession is involuntary: (1) the police activity was objectively coercive; (2) the coercion was sufficient to overbear the will of the accused; and (3) the accused's will was overborne because of the coercion. McCall v. Dutton, 863 F.2d 454, 459 (6th Cir.1988), cert. denied, 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989). See also Kordenbrock v. Scroggy, 919 F.2d 1091, 1100 (6th Cir.1990) later proceeding, 1990 WL 180584, 1991 U.S.App. LEXIS 2711 (6th Cir.1991), and cert. denied, —— U.S. ——,

---

10. The Court notes that this second issue also implicates the Fifth Amendment. Essentially, the defense claims that the allegedly illegal nature of the detention—a Fourth Amendment violation—vitiated the voluntariness of the confession and thereby violated his Fifth Amendment due process rights. The Supreme Court has previously noted the interdependency of the Fourth and Fifth Amendments in this context:

> Thus, even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken. [sic]

> Wong Sun [v. United States] requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be "sufficiently an act of free will to purge the primary taint." 371 U.S. [471] at 486, 83 S.Ct. [407] at 416 [9 L.Ed.2d 441 (1963)].

Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975). See also Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 2259–60, 60 L.Ed.2d 824 (1979); Taylor v. Alabama, 457 U.S. 687, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982).

11. This is the only example of coercive behavior submitted by the defense.

111 S.Ct. 1608, 113 L.Ed.2d 669 (1991) (due process requires that court consider both the procedural fairness and the compulsion level created by police practice); *U.S. v. Newman,* 889 F.2d 88, 94–95 (6th Cir.1989), *cert. denied,* 495 U.S. 959, 110 S.Ct. 2566, 109 L.Ed.2d 748 (1990) (evidence that defendant suffered from some deficiency that impaired his cognitive or volitional capacity insufficient to establish involuntary confession; some police coercion necessary).

Therefore, under *McCall,* the Court must make an initial determination as to whether the agents' actions were objectively coercive. The only evidence before the Court that the agents beat the Defendant is the Defendant's own testimony. The agents both testified under oath that they engaged in no coercive behavior, subtle or blatant. Likewise, Mr. Jackson testified that the agents did not engage in coercive behavior towards him. Thus, to find that the agents beat the Defendant, the Court must find the Defendant's testimony on this point to be credible.

However, as explained above, the Court found the Defendant's testimony as a whole, and, in particular, the episode of the alleged beating, to be unworthy of belief. The Court emphasizes that the physical description of the alleged beating was improbable and inconsistent. The Court further observes that Mr. Jackson, who testified before the Defendant, stated that the agents neither threatened nor struck him during questioning. Therefore, the Court finds that, contrary to the allegations of the Defendant, the agents did not strike or otherwise beat the Defendant. As such, the agents' activity was not objectively coercive under *McCall,* and the Defendant fails to satisfy even the first prong of *McCall.* Thus, the motion to suppress statements on the ground of agent coercion must be denied.

## III. *Illegal Arrest*

The Defendant next claims that he was subject to an illegal detention in violation of the Fourth Amendment, and that his statement, as the fruit of this violation, must be suppressed.[12] This claim is actually bipartite. First, the Defendant claims that he was not an occupant of the raided house. Therefore, his detention *during* the search was unlawful. Second, even if the detention during the search was valid, the detention after the search had been completed was a violation of the Fourth Amendment.[13]

### A. Detention During Search

In *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the Supreme Court held that an occupant may be detained during a valid search. In that case, Detroit police officers encountered the defendant descending his front steps as they were about to execute a search warrant. They requested his assistance in entering the premises and detained him during the search. After finding drugs in the house, the police arrested the defendant and found heroin on his person. While reaffirming the general rule, stated in *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), that an official seizure of a person must be supported by probable cause even if no formal arrest is made, the Court said that some seizures, significantly less intrusive than formal arrest, may withstand scrutiny under the reasonableness standard of the Fourth Amendment. Detention pursuant to a search warrant guarantees the important law enforcement interests of preventing flight in the event that incriminating evidence is found, minimizing the risk to law enforcement personnel, and facilitating the search:

> In these cases the intrusion on the citizen's privacy "was so much less severe" than that involved in a traditional arrest

---

**12.** The Defendant correctly notes that even a voluntary confession may be rejected if it is given as a result of an illegal arrest. *See supra,* n. 10.

**13.** "Thus, the guns and the drugs had already been seized in the search, and the prolonged, continued detention after the search for questioning was an arrest-detention in violation of the Fourth Amendment." Post–Arrest Legal Memorandum at 2.

that "the opposing interests in crime prevention and detection and in the police officer's safety" could support the seizure as reasonable.

*Summers*, 101 S.Ct. at 2591 (quoting *Dunaway*, 99 S.Ct. at 2254).

In the case of a detention attendant to a search warrant, added the Court, there is an objective justification for the detention. *Michigan*, 101 S.Ct. at 2594. A neutral magistrate has made the determination that criminal activity has occurred on the premises and that the police should be given authorization to intrude on the privacy of a home. *Id.* The Court said: "The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Id.* 101 S.Ct. at 2595. For these reasons, the Court concluded:

> Thus, for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.

*Id.* (footnotes omitted).

■ The Defendant concedes that *Summers* permits the detention of an occupant during the effectuation of a valid search. However, the Defendant claims that, as the Defendant was not an "occupant" of the premises, the agents had no right to detain him during the search.

The Defendant cites to Professor Wayne LaFave who wrote that "occupants," in this context, refers only to residents:

Especially because the Court elsewhere refers to the category of persons covered as "residents" who would ordinarily "remain in order to observe the search of their possessions," it would seem that the word "occupants" is not to be loosely construed as covering anyone present. LaFave, *Search and Seizure* (2d Ed.) at 309–10 (footnotes omitted). Professor LaFave based this interpretation on the following: (1) the Supreme Court in *Summers* referred to the occupants as residents; (2) a dictionary definition of "occupant"; and (3) two state cases holding that *Summers* does not apply to visitors. Thus, says the Defendant, as he was not an occupant of the searched residence, *Summers* is inapplicable and the detention was *per se* invalid.

The Court rejects the defense's (and Professor LaFave's) interpretation of "occupants" in *Summers* and instead holds that, for the purposes of *Summers*, an occupant is any individual whose connection to a validly searched premises appears to be more than that of an obviously chance visitor.[14] The Court rejects the reasoning of Professor LaFave above. First, the common understanding of the word "occupant" is one who occupies a particular place.[15] One speaks of an occupant of a car and an occupant of a hotel room. While the term may also refer to a resident, it need not be so limited. Second, the Supreme Court in *Summers* did not state that an occupant is analogous to a resident. In *Summers*, the occupants happened to be residents. This clearly does not mean, however, that, had they not been residents, the detention would have been invalid. Third, the state cases cited by Professor LaFave involve situations in which the defendant was

---

**14.** In this regard, the Court notes that, for example, a repair person or an individual who arrives at the door during a search would not, absent other factors, be considered an occupant.

**15.** The Court observes that, to the extent that a dictionary definition is even probative, Professor LaFave's reliance on a dictionary definition may be misplaced. The *American Heritage Dictionary* defines "occupant" as "One who occupies a position or place." As the second of two definitions, *Webster's Ninth New Collegiate Dictionary* defines occupant as "one who occupies a

particular place; esp: resident." Moreover, the word "occupy" is defined, as a second definition, as "to take up (a place or extent in space)." However, this Court does not rest its decision on hypertechnical dictionary definitions of words. Rather, the question of a person's relationship to a validly searched premises and evidence found therein should turn on the reasonable observations, perceptions, and resulting decisions of the police officers at the time of the search.

clearly a casual visitor to the residence. *See State v. Torres,* 197 Conn. 620, 500 A.2d 1299 (1985) (visitor to apartment); *Lippert v. State,* 664 S.W.2d 712 (Tex.1984) (seen walking to the house on several occasions). Thus, these courts did not have occasion to consider the situation in which a non-resident is present in the searched residence at the time of the officers' entry.

Other courts have given the term "occupant" a broader reading. In a Ninth Circuit case, the court rejected LaFave's narrow interpretation of "occupant." In finding *Summers* applicable to a non-resident of the searched residence, the court held that the Supreme Court intended to use that term in its broader sense:

> The Court clearly framed *Summers* in terms of "occupants", not owners, and explicitly found no constitutional significance in the fact that some of the "occupants" were seized on the sidewalk as they were leaving the house.

*United States v. Taylor,* 716 F.2d 701, 707 (9th Cir.1983). *See also United States v. Pace,* 898 F.2d 1218 (7th Cir.), *cert. denied, Cialoni v. United States,* — U.S. —, 110 S.Ct. 3286, 111 L.Ed.2d 795 (1990).[16] In *United States v. Blanco,* 844 F.2d 344 (6th Cir.), *cert. denied,* 486 U.S. 1046, 108 S.Ct. 2042, 100 L.Ed.2d 626 (1988), occupants of a hotel room were detained and questioned prior to a search. The Sixth Circuit upheld the detention saying:

> Just as when law enforcement officers executing a search warrant for a dwelling or passengers of an automobile detain occupants of the dwelling or passengers of the automobile for a reasonable

period, the agents did not act improperly in this case.

*Id.* 844 F.2d at 351.

The Court observes that, were it to accept the Defendant's very limited definition of occupant, the police would be severely and unrealistically constricted in their ability temporarily to detain persons during the execution of a valid search warrant in which illegal evidence is found. It is clear that, upon entry into a house pursuant to a search warrant, the police do not have the time or means to determine which, if any, of several persons present is a lawful resident of the premises. To so curtail the ability of the police to effectuate a detention during a search would make a mockery of the dictate of *Summers.*

Therefore, the Court rejects the Defendant's contention that "occupant," as used by the Supreme Court in *Summers,* refers solely to resident. Rather, the Court holds that "occupant" refers to any individual on the premises who, from the perspective of the executing officers at the scene, might reasonably have some relationship to the subject premises or the underlying objects of the search or any illegal evidence found therein. Therefore, as the Defendant in this instance was an occupant under *Summers,* the agents were justified in detaining him for a reasonable time pending the outcome of the search.[17]

**B. Detention After Search**

The Court must now determine whether the detention and questioning *after* the completion of the search was permissible.[18]

*Pace,* 898 F.2d at 1239.

---

**16.** The Seventh Circuit said in that case:

> While it turned out that Pace and Besase were not residents of Savides' condominium, it is still significant that they were present in a condominium that a neutral magistrate had found probable cause to believe contained evidence of illegal gambling activities. The police officers could not be sure whether or not Pace and Besase were involved in the gambling nor could they even be sure whether or not Pace and Besase were "occupants" of the condominium. Thus, as in *Summers,* the connection of Pace and Besase to the condominium gave the officers "an easily identifiable and certain basis" for detaining Pace and Besase during the search.

**17.** The Court notes that even if it found that the Defendant could not be legally detained pursuant to *Summers,* it could still find that a brief investigatory detention under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) was not violative of the Fourth Amendment. *See* LaFave, *Search and Seizure* at 311 (holding that *Summers* should not be read as barring use of *Terry*).

**18.** Defendant's illegal detention argument is premised on the allegation that the search had been completed before the agents initially interviewed the Defendant. A review of the suppression hearing testimony indicates that this fact is

For the purpose of analyzing this issue, the Court will divide the events surrounding the search and seizure in this case into three distinct episodes. First, the detention of the Defendant during the search. Second, the detention of the Defendant after the completion of the search but before the initial interview. Third, the detention of the Defendant after the completion of the initial interview.

As noted above, the Court holds that, under *Summers*, the first episode, the detention pursuant to the search warrant, was permissible. Further, there is no dispute that, crediting their testimony, the agents had probable cause to arrest the Defendant (the third episode) once he had admitted to being a convicted felon who had handled the firearms found in the house. Therefore, the continued detention and second round of questioning in the upstairs bedroom was clearly constitutionally permissible in and of itself and would only be invalidated if the previous detention and interview had been impermissible.

■ Thus, the narrow question before this Court is whether the agents, having found contraband at a premises pursuant to a valid search warrant, could, under the Fourth Amendment, detain the Defendant to determine the nexus between the Defendant and the contraband. The issue is somewhat complicated by the fact that the interview occurred in the gray area *after* the search but *before* the agents had probable cause to believe that the Defendant, as opposed to another of the four occupants, had committed a crime.[19] For the reasons discussed below, the Court finds that this second episode qualified as a *Terry* stop and, as such, was permissible under the Fourth Amendment.

The Supreme Court has held that seizures not amounting to probable cause arrest are constitutionally permissible under certain circumstances. In *Terry v. Ohio*, 88 S.Ct. 1868, 1884–85 (1968), the Supreme Court held that the police can stop and briefly detain a person for investigative purposes if that detention is supported by a reasonable suspicion that criminal activity has been committed. *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). A *Terry* stop is based on the rationale that some seizures are substantially less intrusive than arrests and may be warranted to protect officers and aid them in their efforts to detect and prevent crime. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979). In a *Terry* stop, officers may briefly detain a suspect on less than probable cause for the purpose of gaining more information. As phrased by the Supreme Court in *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984):

> Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.

*Id.* 104 S.Ct. at 3150 (footnotes omitted). *See also Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while ob-

---

unclear. It may have been that the search was ongoing during the initial interview. However, for the purposes of this Opinion, the Court will assume that the search had been completed before the occupants were questioned.

**19.** To arrest a defendant, the police must have probable cause that that particular individual committed a crime:

> But, a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. Where the stan-

dard is probable cause, a search or seizure of a person must be supported by probable cause *particularized with respect to that person.* This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.

*Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979) (emphasis added) (citations omitted).

taining more information, may be most reasonable in light of the facts known to the officers at the time").

*Terry* stops occur only when the police seize a suspect without probable cause. If there is no seizure, the suspect is free to leave and the Fourth Amendment is not implicated. If there exists probable cause, the officers have met their burden and may formally arrest the suspect. *Terry* and its progeny have recognized that police conduct does not always fall into these neat categories and there are times when a temporary seizure without probable cause is necessary for officer safety and the goals of crime detection and prevention.

In examining these pre-probable cause seizures, the courts typically do not attempt to find the precise point on the spectrum at which a valid *Terry* stop becomes an invalid arrest. In fact, the courts have eschewed a precise test delineating a *Terry* stop from an arrest:

> We do not suggest that there is a litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop. Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment.

*Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983).[20] Rather, the courts place the burden on the government to demonstrate that the seizure in that particular case was a *Terry* stop and not an arrest. To do so, the government must satisfy a test composed of two distinct factors. These factors are: (1) whether the seizure was based on a

reasonable suspicion of criminal activity and (2) whether it was as brief and limited as necessary under the circumstances. If the government can fulfill both of these factors, the courts generally find a permissible *Terry* stop; if not, the courts reject the seizure on the ground that it amounted to an arrest without probable cause. *See e.g., Royer,* 103 S.Ct. at 1328 ("We also think that the officers' conduct was more intrusive than necessary to effectuate an investigative detention otherwise authorized by the *Terry* line of cases"); *United States v. Richardson,* 949 F.2d 851, 857 (6th Cir.1991) ("When the agents placed Richardson in the back of the police car, they went beyond the bounds of *Terry* "); *United States v. Prior,* 941 F.2d 427, 429 (6th Cir.1991) ("[Officer] Oliver's action satisfies the requirements needed for a valid investigatory stop"); *United States v. Winfrey,* 915 F.2d 212, 216 (6th Cir.1990) ("The government bears the burden of showing the seizure based on reasonable suspicion satisfied the conditions of an investigative *Terry* seizure"); *United States v. Hardnett,* 804 F.2d 353, 356 (6th Cir. 1986) ("As indicated in the language of *Terry,* resolving the question of whether a seizure is an investigative stop, rather than an arrest, generally depends on the reasonableness of the stop under the circumstances").

The *Terry* test is premised on the competing interests of effective law enforcement and individual privacy. First, the government must be able to demonstrate a "reasonable suspicion" that that individual was engaged in criminal activity. *Sokolow,* 109 S.Ct. at 1585. Second, the government must be able to show that the stop was temporary and lasted no longer than necessary to effectuate the purpose of the stop. *Royer,* 103 S.Ct. at 1325. The Sixth Circuit has framed the requisite factors for a valid *Terry* stop as follows:

---

**20.** However, it appears that the courts consider important whether the individual was seized on the spot or whether he was transported to another location. The courts appear more likely to find an arrest, for example, when the suspect has been taken to the police station, *Dunaway v.*

*New York,* 442 U.S. 200, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979), a police interrogation room, *Royer,* 103 S.Ct. at 1327, or a police vehicle, *United States v. Richardson,* 949 F.2d 851, 857 (6th Cir.1991).

(1) whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion; and (2) whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances.

*Hardnett,* 804 F.2d at 356.

As for the reasonable suspicion prong, the Supreme Court in *Sokolow* focused exclusively on the analysis used to determine whether a reasonable suspicion exists:

> The officer, of course, must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch'." The Fourth Amendment requires "some minimal level of objective justification" for making the stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause.

*Sokolow,* 109 S.Ct. at 1585 (citations omitted). The Court further explained its reasoning by quoting its previous decision in *United States v. Cortez:*

> In evaluating the validity of a stop such as this, we must consider the "totality of the circumstances—the whole picture." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). As we said in *Cortez:*
>
> > The process [of determining what constitutes reasonable suspicion] does not deal with hard certainties but with probabilities: Long before the law of probabilities was formulated as such, practical people formulated certain commonsense conclusions about human behavior; jurors as fact finders are permitted to do the same—and so

are law enforcement officers. *Id.,* at 418, 101 S.Ct., at 695.

*Sokolow,* 109 S.Ct. at 1585 (quoting *United States v. Cortez,* 101 S.Ct. 690, 695 (1981)).

In *Sokolow,* the Court found reasonable suspicion on the following facts: the defendant (1) was traveling under an alias; (2) took an evasive or erratic path through the airport; (3) paid $2,100 in cash for two airline tickets from a roll of $20 bills containing nearly twice that amount of cash; (4) travelled 20 hours from Hawaii to Florida in July to spend only 48 hours in Miami. The *Sokolow* Court noted that each of these facts alone would not create a reasonable suspicion, but together they amount to reasonable suspicion. *Id.* 109 S.Ct. at 1586. *See generally United States v. Borrero,* 770 F.Supp. 1178 at 1188–89 (E.D.Mich.1991).

However, even if a law enforcement official has a reasonable suspicion to perform an investigatory detention, he must still satisfy the second prong by effectuating this detention using the least intrusive and most expeditious means available. As noted in *Florida v. Royer:*

> an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

*Id.* 103 S.Ct. at 1325–26. In *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), the Supreme Court eschewed a concrete time limit for investigatory detentions: "Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Id.* 105 S.Ct. at 1574. Rather, a court must determine, looking at the totality of the circumstances, whether "the officers diligently pursued a means of investigation that would dispel or confirm their suspicions quickly." *United States v. Winfrey,* 915 F.2d 212, 217 (6th Cir.1990),

*cert. denied,* — U.S. —, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991).

In addressing this issue, the Sixth Circuit has found that investigatory detentions of 30 or 45 minutes are not unreasonable. *See United States v. Winfrey,* 915 F.2d 212 (6th Cir.1990); *United States v. Knox,* 839 F.2d 285, 290 (6th Cir.1988). *See generally Borrero,* 770 F.Supp. at 1189–91 (discussing Supreme Court and Sixth Circuit case law on length of investigatory detentions).

Initially, the Court finds that, at the time of the initial interview, the agents lacked probable cause to arrest the Defendant.[21] The Court further finds that the Defendant had been seized by the agents.[22] Therefore, the Court must decide whether this post-seizure, pre-probable cause detention was permissible under the Fourth Amendment. Namely, was there a reasonable suspicion of criminal activity sufficient to justify an intrusion into the Defendant's privacy and was the detention brief and limited in scope.

Applying the *Sokolow* test, the Court must determine whether, from the perspective of the officers at the scene, there was a reasonable suspicion that the Defendant may have been involved in criminal activity after the firearms and drugs had been discovered. The Court finds that there was indeed "some minimal level of objective justification" for further investigation in the instant case. First, a neutral magistrate judge had determined that there was probable cause to believe that one or more individuals at the searched residence was engaged in criminal activity. Second, the four occupants were in a known drug house in which resided a convicted felon. Third, there was nothing to suggest to the officers upon their entry that the Defendant was merely a casual visitor.[23] Finally, a valid search revealed three firearms and narcotics, both of which had been identified in the search warrant. At this point, the agents had a reasonable suspicion to believe that any of the four occupants could be connected to this evidence. This served as objective justification for the temporary detention of each occupant, including the Defendant.

The Court also finds that the manner and duration of the investigatory detention in this case was well within the defined ambit of a *Terry* stop. The precise duration of the initial interview is not clear. However, the testimony of the agents makes clear that it was very brief. The agents were simply attempting to determine which of the four residents was connected to the firearms and controlled substances. In the Defendant's case, once they had determined that a more prolonged interview was necessary, they ceased questioning him and asked him to return temporarily to the living room area.

Furthermore, nothing about the initial interview suggests that it was conducted in an improper manner. First, and perhaps foremost, prior to any questioning, the occupants were all effectively Mirandized. Two agents questioned each occupant. All three were standing at all times. The area of questioning was open and connected to the living room. Finally, as mentioned above, the agents testified that no coercion,

---

**21.** The Court notes, without discussion, that this finding is not entirely free from doubt, and that the concept of probable cause has not yet been rendered static and precisely defined. Arguably, having found the drugs and the firearms on the premises, the agents had probable cause to arrest each of the four occupants of the house. In *United States v. Pace,* 898 F.2d 1218 (7th Cir.1990), the court found probable cause and upheld the arrest of two occupants of an apartment on the ground that they were observed exiting rooms in which the police found large amounts of cocaine and/or cash. *Id.* at 1240.

**22.** There is no dispute that the Defendant was indeed "seized" during the period of the initial interview. He remained handcuffed and was not free to leave or move about. *See United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980).

**23.** The precise nature of the Defendant's relationship to the premises remains unclear. In his sworn statement, he claimed to have been living at the house for about two months. At the evidentiary hearing, he claimed to have just arrived that morning. However, as noted above, the Defendant's testimony on the stand was not credible. On the other hand, none of the Defendant's personal belongings was introduced, or even alluded to, at the hearing as having been found at the house. This is not dispositive, but clouds the issue.

subtle or direct, was used during the interview.[24]

The important element to bear firmly in mind here is that, to fulfill their role in enforcing the laws, law enforcement officials must be permitted to question suspects so as to determine whether further detention is needed. This interim period is crucial both to ensure the efficacy of police work and to ensure that innocent individuals with no nexus to the criminal activity are not unjustly arrested. In this interim period, the police may detain and question an individual for the purpose of determining his or her relationship to the contraband discovered during the search. Those whom the police discover to have no discernible connection to the contraband may then be released from custody; those whom the police believe to be connected to the contraband may then be arrested, if the detention has revealed that there is probable cause supporting that arrest.

In this case, viewed in its totality, it is clear that the initial investigatory detention was the most expedient and efficient means of determining which of the occupants warranted further questioning. As such, the Court holds that the investigatory detention of the Defendant after the search was not violative of the Fourth Amendment.[25]

## CONCLUSION

The Court finds that the Government has supported its burden that the statement obtained as incident to the valid search warrant was neither the result of coercion nor the result of an illegal detention. Rather, the parties' briefs and the evidence at oral argument indicate that the Defendant freely confessed his possession of the firearms and that the brief detention during and immediately after the search was not a violation of the Fourth Amendment.

NOW, THEREFORE;

IT IS HEREBY ORDERED ADJUDGED AND DECREED that the Defendant's Motion to Suppress Statement and Supplement to Motion to Suppress are DENIED.

IT IS FURTHER ORDERED that Defendant's Motion to Sever Defendants/Offenses is GRANTED, and that the case against the Defendant shall be severed from that against Defendant Joe Fountain.

SO ORDERED.

---

**24.** If the agents had engaged in any coercive behavior, it seems likely that the other three prone occupants in the adjacent room would have been able to detect it.

**25.** To the extent Fifth Amendment considerations are implicated, the effective Mirandization of the Defendant prior to his questioning insures sufficient protection of these important constitutional rights.